UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DESMOND HODGE,

        Plaintiff,

-vs-                                  Case No.  6:09-cv-1059-Orl-19DAB

ORLANDO UTILITIES COMMISSION,
DEDICATED TRANSPORT, LLC d/b/a
BAKER'S TRANSPORT SERVICE OF
LAKELAND, INC., DAVID POPE,

        Defendants.
_____

# ORDER

This case comes before the Court on the following:

1.    Motion for Summary Judgment by Defendant David Pope (Doc. No. 79, filed Dec. 6, 2010);

2.    Motion for Summary Judgment by Defendant Orlando Utilities Commission (Doc. No. 80, filed Dec. 6, 2010);

3.    Notice of Filing Deposition Transcripts of Richard Baker, Garfield Blair, Charles Bickhart, Vincent Gallucci, Desmond Hodge, David Martinez, Alan Planeta, David Pope, and Charles Wright in Support of Motions for Summary Judgment by Defendants David Pope and Orlando Utilities Commission (Doc. No. 81, filed Dec. 6, 2010);

4.    Amended Notice of Filing Deposition Transcript of Desmond Hodge in Support of Motions for Summary Judgment by Defendants David Pope and Orlando Utilities Commission (Doc. No. 83, filed Dec. 10, 2010);

5.      Response to Defendants' Motions for Summary Judgment by Plaintiff Desmond

Hodge (Doc. No. 84, filed Dec. 20, 2010); and

6.      Reply to Plaintiff's Response in Opposition to Motions for Summary Judgment by

Defendants Orlando Utilities Commission and David Pope (Doc. No. 85, filed Jan.

3, 2011).

**Background**

## I.  Undisputed Facts

This case arises from an altercation between Plaintiff Desmond Hodge, an African-American

truck driver employed by Dedicated Transport, LLC, d/b/a Baker's Transport Service of Lakeland,

Inc. ("Dedicated Transport"), and Defendant David Pope, a Laboratory Technician I employed by

Defendant Orlando Utilities Commission ("OUC") at the Stanton Energy Center, a power plant

owned by OUC.

On the morning of July 25, 2007, Pope was "overseeing the unloading" of anhydrous

ammonia from a tanker truck driven by Charles Bickhart, an employee of an OUC contractor, Tanner

Industries.  (Doc. No. 81-3 at 9; Doc. No. 81-8 at 42.)  As part of his duties, Pope marked off a safety

zone between the tanker and the adjacent road with two orange cones, set up a two-sided, sawhorse-

type speed limit sign stating "5 miles [per] hour,"[1] and activated the flashing yellow light on the

---

[1] The parties dispute where Pope placed the speed limit sign relative to the tanker.
According to Bickhart, Pope placed the orange cones ten feet in front of and ten feet behind the
tanker alongside the road, which was between twenty and twenty-five feet away from the tanker.
(Doc. No. 81-3 at 31-32.)  Bickhart observed Pope set the speed limit sign halfway between the
cones "just about in the travel lane of the road."  (*Id.* at 32.)  On the other hand, Hodge maintained
that the speed limit sign was "under the tank, facing out."  (Doc. No. 83-1 at 95; *see also id.* at 100
(noting that the speed limit sign was "under the truck").)  Pope testified that the photographs marked
364 and 365 and referenced in his deposition accurately depicted the placement of the cones and
(continued...)

speed limit sign.  (Doc. No. 81-3 at 91; Doc. No. 81-8 at 50-51, 53-55.)  Pope was also tasked with being a "safety lookout" while ammonia was unloaded.  (Doc. No. 81-8 at 69.)

      Pope testified that his position at OUC was Laboratory Technician I and that he had never been designated a "site supervisor."  (Doc. No. 81-8 at 15-16.)  Although Pope served as a "substitute supervisor for the lab" when his boss, Alan Planeta, was absent, (*id.* at 15, 25), Planeta was not absent on the date of the altercation between Pope and Hodge.  (*Id.* at 66.)  Pope did not supervise anyone on the date of the incident at issue, (*id.* at 18), and there is no evidence of record that Pope served in a supervisory role at any time relevant to this case.

      Bickhart had delivered anhydrous ammonia to the Stanton Energy Center once or twice per month since 2002.  (Doc. No. 81-3 at 13-14.)  On the "majority" of Bickhart's deliveries to the Stanton Energy Center, Pope was the OUC employee who placed safety equipment and monitored the speed of passing trucks while Bickhart unloaded anhydrous ammonia.  (*Id.* at 38.)  Despite the presence of the speed limit sign reducing the speed limit from 15 to 5 miles per hour at the ammonia unloading site, (Doc. No. 83-1 at 86), Bickhart noted that trucks sped past the site "several times during every delivery," including at speeds of "15 or better."  (Doc. No. 81-3 at 36-37.)  When truck drivers sped past the unloading site, Bickhart regularly observed Pope "walk[] out to the edge of the road" parallel with the front of the unloading truck, tell drivers to slow down, and point to the speed limit sign, at which point drivers would "acknowledge [Pope] and go on."  (*Id.* at 40-43, 55.)  According to Bickhart, "[t]he dozens of drivers that [Pope] slowed down . . . never ma[de] any issue except apologizing once they s[aw] the five-mile-an-hour speed limit sign."  (*Id.* at 42.)

---

[1](...continued)
speed limit sign.  (Doc. No. 81-8 at 53-56.)  However, those photographs are not in the record presently before the Court.

Pope observed truck drivers other than Hodge driving over the posted speed limit of five miles per hour "on or about July 25, 2007," but he did not recall stopping or warning any truck drivers to slow down besides Hodge. (Doc. No. 81-8 at 60-61.) Although some truck drivers had been banned from the Stanton Energy Center for speeding prior to July 25, (Doc. No. 81-2 at 16), including one Dedicated Transport driver, (Doc. No. 81-1 at 67), Pope did not request that adverse action be taken against any speeding truck driver besides Hodge on or about July 25 because "after adequate warning, they slowed down and continued on their route without any altercation or risk to the safety of OUC employees or damage to OUC property." (Doc. No. 81-8 at 60.) In addition, there is no evidence of record that Pope requested that any truck driver be banned from the Stanton Energy Center prior to July 25.

On the morning of July 25, Hodge was an at-will employee of Dedicated Transport assigned to drive a truck transporting lime slurry from various water treatment plants to the Stanton Energy Center. (Doc. No. 81-1 at 6-7; Doc. No. 81-5 at 1; Doc. No. 83-1 at 37-38, 42.) Around 11:00 a.m., Hodge entered the Stanton Energy Center with a load of lime slurry and proceeded toward the truck scales. (Doc. No. 83-1 at 82.) Hodge saw Bickhart's tanker, but he did not know that anhydrous ammonia was being unloaded. (*Id.* at 84.) Hodge drove past the tanker at "about 11 miles an hour, very slow." (*Id.* at 86.) When Hodge was "almost past" the tanker, he first observed Pope "way in front" of the tanker looking straight at him and waiving his hands in the air. (*Id.* at 87-88.)

Pope asserted that upon perceiving Hodge driving towards the ammonia tanker at "an excessive rate of speed," he stood out in the road, made himself visible, and made hand gestures signifying slow down. (Doc. No. 81-8 at 42.) As Hodge drove even with Pope, Pope continued to make hand gestures to slow down, pointed at the speed limit sign, and yelled for Hodge to slow

down.  (*Id.* at 42-43.)  Both Pope and Bickhart observed Hodge maintain the same rate of speed as he drove by the tanker.  (*Id.*; Doc. No. 81-3 at 53.)

As Hodge passed the tanker and Pope, Hodge determined that "something must have happened," and he "hit the brakes and stopped."  (Doc. No. 83-1 at 88.)  Hodge believed that he was "probably . . . dragging something" or that he ran over something.  (*Id.*)  Using his rearview mirrors, Hodge observed Pope walking quickly towards him "all excited and waiving," but he could not see underneath his truck or hear Pope shouting.  (*Id.* at 88-89, 101.)  Hodge then opened the door to his truck and heard Pope "shouting" from approximately 40 feet away, and Hodge contended that he "could not make out what [Pope] was saying."  (*Id.* at 89.)  Hodge asserted that he exited his truck while it was still running, stepped back six feet to look under the truck, observed nothing abnormal, and then turned around to find Pope nine inches from his face shouting,[2] "Get back in your truck." (Doc. No. 83-1 at 90-91.)  After hearing this instruction multiple times, Hodge threw his hands up and shouted back to Pope, "What are you talking about," and "What's going on."  (*Id.* at 91, 93-94.) Hodge maintained that Pope replied by shouting, "You're speeding; don't you see the sign over there [that] says 5 miles an hour," "You're creating a confrontation; get back in your truck," and "Get back in your truck."  (*Id.* at 91-93, 95.)  Hodge and Pope remained nine inches apart.  (*Id.* at 91.)  Hodge then shouted to Pope, "[y]ou better back up; you're not speaking to your child here."  (*Id.*)  Pope responded by moving back from Hodge.  (*Id.*)  Although Hodge contended that Pope was "blocking" him from reentering his truck, Hodge had his hands on his truck at one point during the confrontation and only needed to "turn away from" Pope to board his truck.  (*Id.* at 98.)

---

[2] Both Hodge and Pope testified that they shouted and yelled at each other throughout the incident.  (Doc. No. 83-1 at 100; Doc. No. 81-8 at 45, 84.)

Hodge asked Pope where the five mile per hour speed limit sign was posted, and Pope pointed to the sign. (*Id.* at 95.) Hodge then shouted, "You expect me to see that? You expect me to see that sitting there under the truck?" (*Id.* at 100.) According to Hodge, Pope walked away and shouted in a manner that was "toned down a bit," "I'm calling security to throw you out of here," "All you blacks are alike," and "I'll get you." (*Id.* at 95, 101.) Hodge replied by shouting, "Call who you want."[3] (*Id.* at 95.)

Upon walking away from Hodge, Pope called security at the Stanton Energy Center. (Doc. No. 81-8 at 75.) Pope told an unspecified security officer that he had "problems" and "a

---

[3] The testimony of Pope and of Bickhart present a different account of the events subsequent to Hodge stopping his truck. Pope maintained that when Hodge stopped, he pointed to the speed limit sign and told Hodge that the speed limit was five miles per hour. (Doc. No. 81-8 at 45.) Hodge allegedly rolled down his window and yelled in response, "I was going five miles an hour," to which Pope replied, "No, you weren't. Slow down and go on." (*Id.*) Hodge then backed up his truck and took off his seat belt, which prompted Pope to yell, "Do not get out of your truck." (*Id.*) Hodge exited his truck, and Pope continued to yell, "Get back in your truck and leave." (*Id.* at 45-46.) Upon exiting his truck, Hodge "came straight at Pope," waved his arms, and screamed at Pope. (*Id.* at 46.) As Hodge approached Pope, Pope pointed at Hodge's truck and yelled, "Get back in your truck and leave." (*Id.* at 47.) Hodge continued to advance toward Pope and "got right up in [Pope's] face." (*Id.*) Pope then stated, "Get in the truck or I'm calling security." (*Id.* at 48.) According to Pope, Hodge made no attempt to move. (*Id.* at 48-49.) As Pope turned away to call security, Pope observed Hodge get back in his truck and drive away. (*Id.* at 49.) Pope denied making any comment to Hodge concerning his race, including the statement "all you blacks are alike." (*Id.* at 83-84.)

According to Bickhart, Pope yelled at Hodge to slow down and pointed to the speed limit sign after Hodge passed the sign and the tanker. (Doc. No. 81-3 at 54, 88.) Hodge "immediately swung his head around," "slammed on his brakes," put his truck in reverse, and "raced back" parallel with the anhydrous ammonia tanker. (*Id.* at 54-56.) Bickhart perceived that Hodge was reaching for his seat belt to exit his truck, and he heard Pope command Hodge to stay in his truck. (*Id.* at 57.) Hodge then exited his truck and "beelined straight to" Pope with "his hands clenched at his side." (*Id.* at 58.) Bickhart thought that Hodge would "pulverize" Pope. (*Id.*) Bickhart observed Hodge approach Pope and heard Pope shout, but he could not hear what was said. (*Id.* at 59.) According to Bickhart, Pope did not move despite the fact that Hodge was "in [Pope's] face" and "raise[d] his hand" to hit Pope. (*Id.* at 59-61.) Bickhart then observed Hodge and Pope walk away from each other. (*Id.* at 59.) Thereafter, Pope told Bickhart that he was calling security, that Hodge "needs to go," and that Pope "was going to get [Hodge] ejected from the site." (*Id.* at 62-63, 67.)

confrontation with a driver" and would like the driver removed from the site. (*Id.* at 76.)  Pope maintained that he called security because "OUC stresses a policy of feeling safe at the workplace" and "because of the actions of [Hodge], [he] didn't feel safe in the workplace." (*Id.*)  After speaking with security, Pope called his supervisor, Alan Planeta. (*Id.* at 75.)  Pope "basically summarized the incident" and informed Planeta that he had called security and requested Hodge's removal from the site because he "felt threatened" by Hodge. (*Id.* at 78, 80.)  According to Pope, Planeta concurred with Pope's actions. (*Id.* at 78.)  Pope maintained that security "paged" him about ten minutes after Pope spoke with Planeta. (*Id.*)  After Pope again summarized the situation, an unidentified security officer stated that security would "get back" to Pope, but Pope was not subsequently contacted by security. (*Id.*)

David Martinez, a security contractor for OUC at the Stanton Energy Center, received a telephone call from Pope shortly after the incident during which Pope recounted his version of the events. (Doc. No. 81-9 at 8, 15.)  According to Martinez, Pope requested that Hodge be banned from the site for failing to follow the posted speed limit and for "getting confrontational." (Doc. No. 81-6 at 15; Doc. No. 79-10 at 2.)  Martinez told Pope that he needed to speak to Pope's supervisor before that decision was made. (Doc. No. 81-6 at 15.)  Martinez then called Planeta, who, after speaking with Pope but not Bickhart or Hodge about the incident, "took [Pope's] word" and instructed Martinez to ban Hodge from the Stanton Energy Center.[4] (*Id.* at 16, 34, 43; Doc. No. 81-7 at 61, 70.)

---

[4] In his testimony Vincent Gallucci, the head supervisor of the Stanton Energy Center at the time of the incident, "believed" that security, in particular Charles Wright, the security director for OUC at the Stanton Energy Center, banned Hodge and that Hodge had been banned while Gallucci was on vacation. (Doc. No. 81-4 at 5, 18-19, 35; Doc. No. 81-9 at 8.)  Gallucci later testified that he did not know who made the initial decision to ban Hodge. (Doc. No. 81-4 at 32.)  Thus, Gallucci had no personal knowledge of the events of July 25.

Planeta ordered Hodge to be banned because he was concerned for the safety of "Pope or anybody." (Doc. No. 81-7 at 34.)  On or before Friday, July 27, Planeta spoke to Garfield Blair, the OUC engineer who served as Dedicated Transport's contact with OUC, about the incident and noted that he did not think it was proper for Hodge to be allowed back on site because Hodge "posed an immediate threat" to Pope.  (*Id.* at 25-26, 40; Doc. No. 81-2 at 9.)

Twenty minutes after the incident, as Hodge was unloading his truckload of lime slurry, Martinez approached Hodge. (Doc. No. 83-1 at 96.)  According to Hodge, he did not "tell [Martinez] anything" about what happened except that he was not speeding as Pope claimed.  (Doc. No. 83-1 at 102.)  Hodge conceded that he did not tell Martinez about Pope's alleged statement "all you blacks are alike."  (*Id.* at 104; Doc. No. 81-6 at 16-17.)  Although Hodge and Martinez dispute whether Hodge admitted to getting out of his truck, (Doc. No. 81-6 at 17; Doc. No. 83-1 at 103), Martinez maintained that he advised Hodge, "[A]s soon as you got out of your truck, you took [the] role as the aggressor, and they're going to ban you from the property." (Doc. No. 81-6 at 17.)  Martinez also recalled Hodge stating that he would "probably . . . lose [his] job over this."  (*Id.*)  According to Hodge, Martinez ended the conversation by stating, "Let me go talk to [Pope] and see if we can brush this under the rug; he wants you out of here." (Doc. No. 83-1 at 97, 103.)  Hodge then finished unloading his truck, left the site, and delivered a second load of lime slurry to the Stanton Energy Center later that afternoon.  (Doc. No. 81-6 at 18; Doc. No. 83-1 at 161-62.)

After speaking with Hodge, Martinez prepared an incident report and a memorandum notifying the gate security guards that Hodge had been banned. (Doc. No. 81-6 at 10-11.)  Martinez asserted that he sent the original incident report to Wright and retained a copy.  (*Id.* at 11.)  According to Martinez, the incident report contained Hodge's explanation that he got out of his truck because

he could not hear what Pope was saying.  (*Id.* at 27-28.)  There is no evidence of record that Wright actually reviewed the initial incident report, and Wright conceded that it was "possible" that the incident report was lost or never sent to his office in the first place.[5]  (Doc. No. 81-9 at 46.)

At 12:08 p.m. on July 25, Pope sent an email documenting the incident to Planeta and Blair, and Pope sent a copy of the email to Dwayne Campbell, who supervised Planeta.  (Doc. No. 79-13 at 1; Doc. No. 81-8 at 83, 86, 88; Doc. No. 81-7 at 8-9.)  In the email, Pope identified Hodge's truck as a "BTS truck" based on the shape of the truck trailer, the fact that lime slurry was delivered in a trailer of that shape, and his understanding that only Baker's Transport delivered lime slurry to the Stanton Energy Center.  (Doc. No. 81-8 at 87-88, 111; Doc. No. 79-13 at 1.)  Pope's email also stated, "[T]he driver [is] a b/m."  (Doc. No. 79-13 at 1.)  Pope maintains that he did not receive an immediate response to this email.  (Doc. No. 81-8 at 91.)

At some point on July 25, Pope called Blair to inform him of the incident, including the fact that Hodge has been speeding past the ammonia tanker, and to request that Hodge be "banned permanently" from the Stanton Energy Center.  (Doc. No. 81-2 at 11, 14.)  Pope did not mention to Blair that any comments were made during the altercation about Hodge's race.  (*Id.* at 12.)  Blair told Pope that he would investigate the incident.  (*Id.*)  Blair then called Richard Baker, Hodge's supervisor at Dedicated Transport, to inform Baker that Hodge "got into an altercation with one of OUC's employees," to ask Baker "basically what had happened," and to notify Baker that Hodge was "temporarily banned" from the Stanton Energy Center pending further investigation.  (*Id.*; Doc.

---

[5] Because Wright subsequently could not find either copy of the incident report, Wright instructed Martinez to prepare a summary of the incident, and Martinez did so from memory on January 17, 2008.  (Doc. No. 81-6 at 14; Doc. No. 81-9 at 45-47.)  In that summary, Martinez noted that Hodge explained on the date of the incident that he "did not see the posted speed limit sign" and that he exited his truck "to see what [Pope] was yelling at."  (Doc. No. 79-10 at 2.)

No. 81-1 at 27-28.)  At the time of Blair's call to Baker, Hodge had not yet informed Baker of the incident.  (Doc. No. 81-1 at 29; Doc. No. 83-1 at 162.)

At approximately 6:00 a.m. on Thursday, July 26, Baker called Hodge.  (Doc. No. 81-1 at 28.)  Hodge told Baker his version of the events, but he did not tell Baker that Pope stated "all you blacks are alike."  (Doc. No. 83-1 at 106, 110; Doc. No. 81-1 at 36.)  According to Baker, Hodge admitted that he heard Pope's instructions to stay in his truck, got out of his truck, and got into a "verbal confrontation" with Pope.  (Doc. No. 81-1 at 29.)  Baker also recalled Hodge's explanation that he got out of his truck despite hearing instructions to the contrary because he "couldn't hear [Pope] real well because . . . the truck was running."  (*Id.* at 30.)  Baker asked Hodge why he did not call to inform him about the incident, and Hodge replied by stating that "he thought it wasn't anything major."  (*Id.* at 29.)  Baker informed Hodge that he was not permitted back at the Stanton Energy Center and should not go to work until he heard from Baker.  (Doc. No. 83-1 at 105-06; Doc. No. 81-1 at 41.)  According to Hodge, Baker also said that he would try to reach OUC that day "to see if we could iron this out."  (Doc. No. 83-1 at 106.)  Baker testified that on Friday, July 27, he called Blair and was notified that OUC officials would meet on Monday to discuss the incident. (Doc. No. 81-1 at 31.)

At some point, Blair suggested that Baker contact Pope directly to discuss the incident. (Doc. No. 81-2 at 15-16.)  Baker testified during his deposition that he spoke with an unspecified individual at OUC to "plead [Hodge's] case."  (Doc. No. 81-1 at 44.)  Baker conceded that "it's very possible" he spoke to Pope in this instance.  (*Id.* at 46.)  According to Pope, a Dedicated Transport supervisor called him to ask "if there was any way [he] would change [his] mind as to [his] request" to have Hodge banned from the Stanton Energy Center.  (Doc. No. 81-8 at 116.)  Upon saying no,

Pope was asked "if there was anybody that could override [his] decision." (*Id.*) Pope responded by providing a list of his supervisors and stating that "everybody above [him] could override [his] decision, but [he] thought that they would support [him]." (*Id.*) According to Pope, the supervisor then stated, "There's going to be a problem with this . . . because [Hodge] is black." (*Id.* at 117.) Pope responded, "I'm through with this conversation," and hung up. (*Id.*) Baker denied ever stating that the incident involving Hodge could be a problem due to Hodge's race. (Doc. No. 81-1 at 46.)

At 9:57 a.m. on Wednesday, August 1, Pope sent an email to Vincent Gallucci stating that he had "spoken with a [Dedicated Transport] supervisor (who called me)," and noting that "Blair . . . in [his] opinion supported [Dedicated Transport]." (Doc. No. 79-12 at 1.) Pope felt that Blair did not take his complaint about Hodge seriously because Pope was a former police officer and because Blair was prejudiced against police officers. (Doc. No. 81-8 at 118-19.) Pope also stated in his email to Gallucci, "As of today, my feelings are that OUC has ignored my concerns, and to me this is totally unacceptable." (Doc. No. 79-12 at 1.) Pope maintained that at the time he sent the email, he did not know that anyone at OUC had contacted Dedicated Transport about the incident or had taken any steps to ban Hodge from the Stanton Energy Center.[6] (Doc. No. 81-8 at 94.) At 10:31 a.m., Gallucci forwarded Pope's email to Charles Wright and Garfield Blair among others, stated that he was on vacation when the incident took place, and requested "feedback." (Doc. No. 79-12 at 1.) On August 1, after Pope sent the email to Gallucci, he met with Gallucci, explained his

---

[6] Pope testified that at some point after meeting with Gallucci, he learned that Hodge had been barred from the Stanton Energy Center on the date of the incident, but he was not told who gave that order. (Doc. No. 81-8 at 102.)

"frustration with security" concerning the incident, and requested that Gallucci follow-up.[7] (Doc. No. 81-8 at 92-94, 115.)

According to Blair, at some time between 10:00 a.m. and 2:00 p.m. on August 1,[8] he was called to a meeting with Gallucci, Planeta, Pope, and Wade Gillingham, the maintenance manager at the Stanton Energy Center, to discuss the incident. (Doc. No. 81-2 at 13, 31-32, 35.) Pope told his version of events during the meeting. (*Id.* at 13.) Although Hodge did not explain his version of events at the meeting, Blair had obtained Hodge's version of events from Baker at some point prior to the meeting. (Doc. No. 81-2 at 33-34.) Hodge's race was not discussed at the meeting, (*id.* at 22, 27), and there is no evidence of record that Pope's alleged statement, "All you blacks are alike." was discussed at the meeting. According to Blair, "everybody basically took a vote that [Hodge] should be banned permanently from the site, since he was warned to stay inside the truck and he did not, and then he came out and [Hodge and Pope] got into a verbal confrontation outside of the truck." (*Id.* at 13-14.) Blair later testified that "everybody agreed in the meeting that [Hodge] should be banned due to the fact that there was almost a physical confrontation." (*Id.* at 32.) Blair further stated that everyone present at the meeting "felt that [Hodge] was a physical threat to OUC employees, and if that was the case, he should not be allowed back on site." (*Id.* at 33.) After the

---

[7] Pope initially testified that this meeting with Gallucci occurred on Monday, July 30. (Doc. No. 81-8 at 93.) However, Pope also testified that he sent an email to Gallucci requesting a meeting before he met with Gallucci, (*id.* at 92), and that he neither sent nor received any emails regarding the incident between the July 25 email to Planeta, Blair, and Campbell and the August 1 email to Gallucci requesting a meeting. (*Id.* at 115.) Pope conceded that based on his emails, it was "possible" that he did not meet with Gallucci until August 1. (*Id.*)

[8] Blair initially testified that this meeting occurred on Monday, July 30, (Doc. No. 81-2 at 13), but he later testified that the meeting took place after Pope's email to Gallucci on August 1 at 9:57 a.m., which he was forwarded at 10:31 a.m. (*Id.* at 31-32; Doc. No. 79-12 at 1.) When asked whether the meeting took place between 10:00 a.m. and 2:00 p.m. on August 1, Blair responded affirmatively. (Doc. No. 81-2 at 35.)

meeting, Blair called Baker to inform him that Hodge was banned permanently from the Stanton

Energy Center and that the decision was final.  (*Id.* at 14-15.)  Baker then informed Hodge of this

decision.[9]  (Doc. No. 83-1 at 107; Doc. No. 81-1 at 35.)

At the time Hodge was banned from Stanton Energy Center, all Dedicated Transport truck

drivers had to enter the Stanton Energy Center as part of their jobs, as Dedicated Transport's only

delivery contract at the time was with OUC to deliver lime slurry to the Stanton Energy Center.

(Doc. No. 81-1 at 6-7, 66.)  According to Baker, "there was nothing else [he] could do to keep

[Hodge] employed," so Hodge was terminated from Dedicated Transport.  (*Id.* at 65.)  Baker

asserted that he had no intention of terminating Hodge before the incident and that Hodge would not

have been terminated had he been permitted back at the Stanton Energy Center.  (*Id.* at 75-77.)

At 2:04 p.m. on August 1, Gillingham sent Campbell, Gallucci, and Blair an email stating

that the name of the driver involved in the incident with Pope was Desmond Hodge.  (Doc. No. 79-

14 at 1.)  At 2:15 p.m., Gallucci responded to all recipients, stating, "Please make sure that this

individual is no longer allowed on site at Stanton Energy Center."  (*Id.*)  Wright responded to

Gallucci by email at 2:47 p.m., stating "[Hodge] has been placed in that category as I recall."  (*Id.*)

After receiving Pope's August 1 email from Gallucci, Wright responded to Gallucci by

stating that he would speak to Martinez when he returned from vacation about Pope's "failure to get

a timely backup from a security officer."  (Doc. No. 79-12 at 1.)  When Martinez returned from

---

[9] Hodge testified during his deposition that Baker called to inform him of the permanent ban around noon on Monday, July 30.  (Doc. No. 83-1 at 107.)  Hodge wrote in his EEOC Intake Questionnaire dated August 28, 2007, that Baker notified him that he would not be allowed back on the premises "one week" after the incident, which was August 1, 2007.  (Doc. No. 79-8 at 5.)  When asked during his deposition, Baker could not recall when Blair notified him that Hodge was permanently banned and when he notified Hodge of the permanent ban.  (Doc. No. 81-1 at 32.)

vacation on Monday, August 6, Wright conferred with Martinez and composed the following email

to Gallucci:

> I spoke with Captain Martinez today about the BTS driver incident.  The driver was
> barred from [the Stanton Energy Center] the day that this occurred when Mr. Pope
> told security what occurred and requested that the driver be barred.  As Paul Harvey
> says the rest of the story is this:  Driver told security he did not see the 5 mile-an-
> hour sign that was posted by Mr. Pope and that is why he was driving at 15 miles-an-
> hour.  The driver said Mr. Pope yelled something at him, he could not hear.  The
> driver said he exited the truck to confirm what Mr. Pope was saying, and this is when
> he was told about the 5 mile-per-hour sign.

(Doc. No. 81-4 at 41.)  Gallucci then responded as follows:

> Thanks, Charlie.  I don't know about the explanation of getting out of the cab to see
> what [Pope] was saying, but I guess there's two sides to every story.

(*Id.* at 52.)

According to Gallucci, Hodge's ban was a "done deal" notwithstanding Wright's email

containing Hodge's version of events.  (*Id.* at 43.)  Gallucci noted from personal experience that the

speed limit sign generally was placed in a "pretty visible" location, and he explained that Hodge's

claim that he did not see the sign, absent any assertion or evidence that the speed limit sign was not

visible at the time, meant that Hodge was not paying attention and supported the ban.  (*Id.* at 46-48.)

Gallucci further stated that when a contractor's employee, like Hodge, breaks a posted 5 mile per

hour speed limit, the contractor's employee may be permanently banned even if the speed limit sign

was out of the driver's view.  (*Id.* at 53-54.)

Prior to July 25, 2007, Pope had never met or spoken to Hodge, and Pope "did not know any

details about Hodge's employment relationship" with Dedicated Transport.  (Doc. No. 79-5 ¶ 2.)

In addition, Pope has not spoken with Hodge since the incident at issue occurred.  (*Id.*)  Prior to the

commencement of this lawsuit, Pope knew that OUC had contracted with Dedicated Transport to

deliver lime slurry to the Stanton Energy Center, but Pope was not aware of the specific terms of that contract and had no role in administering the contract.  (*Id.* ¶ 3.)  Pope maintains that he did not make the decision to ban Hodge and that while he agreed with the decision, he did not know that Dedicated Transport would have no alternative work for Hodge.  (*Id.* ¶¶ 5-6.)

## II.  Procedural History

On September 4, 2009, Hodge filed an Amended Complaint consisting of four counts: (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, against OUC and Dedicated Transport; (2) intentional interference with contract in violation of 42 U.S.C. § 1981 against OUC and Dedicated Transport; (3) tortious interference with contract against OUC; and (4) tortious interference with contract against Pope. (Doc. No. 31.)  Thereafter, Dedicated Transport was voluntarily dismissed from the case.  (Doc. No. 78, filed Nov. 12, 2010.)

On December 6, 2010, OUC and Pope separately moved for summary judgment on all counts asserted against them in the Amended Complaint.  (Doc. Nos. 79-80.)  Hodge filed a response in opposition to both Motions, (Doc. No. 84), and OUC and Pope filed a joint reply.  (Doc. No. 85.)

## Standard of Review

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case.  *Hickson Corp.*, 357 F.3d at 1259.  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Id.* at 1260.  A court must decide "whether the evidence presents

a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *Id.* On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. In addition, when a claimant fails to produce "anything more than a repetition of his conclusory allegations," summary judgment for the movant is "not only proper but required." *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981).

## Analysis

### I.  Counts I-II: Title VII Race Discrimination and Violation of 42 U.S.C. § 1981 against OUC

Hodge asserts a Title VII race discrimination claim and a claim for interference with his employment contract with Dedicated Transport in violation of 42 U.S.C. § 1981 against OUC in Counts I and II of the Amended Complaint, respectively. (Doc. No. 31 at 3-12.) Both of these claims require proof of intentional discrimination by Hodge, and the legal framework for proving

intentional discrimination is the same under Title VII and Section 1981. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Intentional discrimination may be established through direct, circumstantial, or statistical evidence. *Id.* Hodge proceeds only on the basis of direct evidence.[10] (Doc. No. 84 at 9.)

"In a direct evidence case, the plaintiff must produce direct testimony [of] discriminatory motive," *Alton Packaging*, 901 F.2d at 923, and any such evidence must establish the existence of discriminatory intent . . . without any inference or presumption." *Standard*, 161 F.3d at 1330 (citation omitted). The plaintiff must also show that the discriminatory remark was made by a decision maker or, at a minimum, influenced the decision making process at issue. *See id.* ("[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination."); *Holifield v. Reno*, 115 F.3d 1555, 1563-64 (11th Cir. 1997) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." (citations omitted)). "If a plaintiff can provide direct evidence of discriminatory intent, then the [defendant] must prove by a preponderance of the evidence that the same . . . decision would have been made in the absence of the discriminatory intent." *Standard*, 161 F.3d at 1330.

The parties dispute whether Pope's statement to Hodge, "All you blacks are alike. I'll get you."[11] is direct evidence of Pope's motive to ban Hodge on the basis of race. (Doc. No. 84 at 8-11;

---

[10] Because Hodge proceeds only on the basis of direct evidence, (Doc. No. 84 at 9), the Court will not address OUC's arguments directed to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990) ("When a plaintiff proves a case of discrimination by direct evidence, application of *McDonnell Douglas* is inappropriate." (citation omitted)).

[11] Hodge alleged in his EEOC Intake Questionnaire dated August 28, 2007, and testified (continued...)

Doc. No. 85 at 3-5.)  The parties further dispute whether Pope's discriminatory animus can be attributed to OUC because Pope was a decision maker or because OUC was the "cat's paw" of Pope. (Doc. No. 80 at 19-21; Doc. No. 84 at 11-19; Doc. No. 85 at 5-8.)

Assuming without deciding that Pope's statement "All you blacks are alike.  I'll get you." is direct evidence that Pope intended for Hodge to be banned due to his race, Pope's bias cannot be imputed to OUC, and OUC is entitled to summary judgment because, as discussed below, the evidence of record viewed in the light most favorable to Hodge fails to show that Pope was a decision maker or that the "cat's paw" theory is applicable.  *See Holifield*, 115 F.3d at 1563-64 ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." (citations omitted)); *Mauter v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir. 1987) (holding that the statement at issue did not present a genuine issue of material fact as to discriminatory intent because the speaker played no part in the decision to terminate the plaintiff and had no knowledge of the decision making process).  Alternatively, OUC is entitled to summary judgment because it permanently banned Hodge for conduct unrelated to his race that he does not dispute, and thus no finder of fact could reasonably conclude that Pope's racial bias influenced that decision.  *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999) ("[T]he plaintiff must prove that the discriminatory animus behind the recommendation, *and*

---

[11](...continued)
during his deposition that Pope made this statement.  (Doc. No. 79-8 at 2; Doc. No. 83-1 at 95.) Although Pope denies making this statement, (Doc. No. 81-8 at 83-84), the Court must resolve this factual dispute in Hodge's favor at this stage of this proceedings. *Anderson*, 477 U.S. at 255.  Hodge does not assert that any other statement of record constitutes direct evidence of discrimination. (Doc. No. 84 at 9-11.)

*not the underlying employee misconduct identified in the recommendation*, was an actual cause of the other party's decision to terminate the employee.") (emphasis added).

### A.  Pope as Decision Maker

The Court finds no evidence of record that Pope held a position which enabled him to make the decision that Hodge would be banned from OUC.  Although Pope made multiple requests to ban Hodge and provided information to OUC security and his supervisors about the incident, there is no evidence of record to support the contention that Pope was a decision maker involving the determination to ban Hodge.  *See Bass v. Bd. of Comm'rs*, 242 F.3d 996, 1005 (11th Cir. 2001) ("Only statements by the persons involved in the decision making process, here the interview panel members, could constitute direct evidence of discrimination.").

Shortly after the incident on July 25, Pope first contacted OUC security to request that Hodge be banned.  (Doc. No. 81-8 at 75-76.)  After receiving Pope's request that Hodge be banned, OUC security officer David Martinez informed Pope that he would need to speak to Pope's supervisor before the decision to ban Hodge was made.  (Doc. No. 81-6 at 15.)  Pope also informed his supervisor, Alan Planeta, of the incident and requested that Planeta ban Hodge.  (Doc. No. 81-8 at 78, 80.)  Planeta then instructed Martinez to ban Hodge, as he was concerned for the safety of "Pope or anybody."  (Doc. No. 81-6 at 16, 34, 43; Doc. No. 81-7 at 34, 61, 70.)

Pope also informed Garfield Blair of the incident on July 25 and requested that Hodge be "banned permanently."  (Doc. No. 81-2 at 11.)  Blair subsequently called Richard Baker and informed him that Hodge was "temporarily banned" until further notice.  (*Id.* at 12.)  Thus, Planeta and Blair, not Pope, made the initial decisions to ban Hodge on July 25.

In addition to the events of July 25, Pope's lack of authority to ban Hodge is shown by his comments to an unidentified Dedicated Transport supervisor who called him sometime prior to August 1. During the conversation, Pope was asked "if there was any way [he] would change [his] mind as to [his] request" to have Hodge banned from the Stanton Energy Center. (Doc. No. 81-8 at 116.) Upon saying no, Pope was asked "if there was anybody that could override [his] decision." (*Id.*) Pope responded by providing a list of his supervisors, "all the way up to Mr. Gallucci," and stating that "everybody above [him] could override [his] decision, but [he] thought that they would support [him]." (*Id.*) Pope's lack of authority to ban Hodge is further evidenced by Pope's testimony that when he emailed Gallucci on August 1 to request a meeting to discuss his "frustration with security," he did not know that OUC personnel had contacted Dedicated Transport or had taken any steps to ban Hodge from the Stanton Energy Center. (Doc. No. 81-8 at 94.)

Hodge was permanently banned from the Stanton Energy Center by a vote taken at the meeting recalled by Blair on August 1. (Doc. No. 81-2 at 12-14.) At that meeting, which followed attempts by supervisors and security to ascertain the facts surrounding the altercation between Pope and Hodge,[12] Pope recounted his version of events to his supervisors, (Doc. No. 81-2 at 13), and according to Blair, "everybody basically took a vote that Mr. Hodge should be banned permanently." (Doc. No. 81-2 at 13-14.) However, absent any evidence of record indicating that "everybody" who

---

[12] David Martinez spoke to Hodge about the incident approximately twenty minutes after the incident. (Doc. No. 81-6 at 16-17; Doc. No. 83-1 at 96-97, 102-04.) Later that day, Martinez prepared an incident report and a memorandum notifying the gate security guards that Hodge had been banned. (Doc. No. 81-6 at 10-11.) Also on July 25, Blair called Baker to notify him about the incident and to ask Baker "what had happened." (Doc. No. 81-2 at 12.) Although Blair's telephone call on July 25 was the first notice Baker received of the incident, (Doc. No. 81-1 at 27), Blair obtained Hodge's version of events from Baker at some point prior to the August 1 meeting where a vote was taken to permanently ban Hodge. (Doc. No. 81-2 at 34.)

voted included Pope, and in light of Pope's direct, sworn testimony that he did not make the decision to ban Hodge, (Doc. No. 79-5 ¶ 6), it cannot be reasonably inferred that Pope made the decision to permanently ban Hodge on August 1. Thus, Hodge has not met his burden of producing evidence from which a finder of fact could reasonably conclude that Pope was a decision maker.

**B. "Cat's Paw Theory"**

Although Pope has not been shown to be a decision maker, his presumably biased recommendation to ban Hodge "may be actionable if the plaintiff proves that the recommendation directly resulted in the [adverse employment action]." *Stimpson*, 186 F.3d at 1331. Pursuant to the "cat's paw" theory, the requisite causation is established "if the plaintiff shows that the decision maker followed the biased recommendation without independently investigating the complaint against the employee." *Id.* at 1332. "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.*

A decision maker performs an independent investigation precluding application of the "cat's paw" theory where the decision maker "conducts his own evaluation and makes an independent decision." *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001) ("Where a decision maker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee." (citations omitted)). Further, an independent investigation does not necessarily require independent verification of the facts underlying the allegedly biased recommendation, so long as an independent analysis of those facts is conducted. For example, in *Dowlen v. Nicholson*, No. 06-22197-CIV, 2007 WL 3010896 (S.D. Fla. Oct. 12, 2007), *aff'd*, 288 F. App'x 572 (11th Cir. 2008), the "cat's paw" theory was found inapplicable despite the decision maker's admission that he "did not independently investigate the basis" for the

allegedly biased recommendation. *Id.* at *9. Noting the absence of evidence that the decision maker regularly approved the recommendations of the allegedly biased recommender, the court in *Dowlen* found that the decision maker did not "rubber stamp" the allegedly discriminatory recommendation because he requested and reviewed information provided by the allegedly biased recommender before concurring with the recommendation to terminate the plaintiff. *Id.*

Like in *Dowlen*, there is no evidence of record that Pope had requested that a truck driver be banned from the Stanton Energy Center prior to Hodge, let alone that such recommendations were regularly accepted by Planeta, Blair, or any other decision maker. (Doc. No. 81-1 at 60; Doc. No. 81-2 at 16.) Further like the decision maker in *Dowlen* who independently evaluated the facts provided by the allegedly biased recommender, *Dowlen*, 2007 WL 3010896, at *9, both Planeta and Blair evaluated Pope's version of the incident and personally decided, consistent with Pope's recommendation, that Hodge should be banned on July 25. Although Planeta "took [Pope's] word" about what happened, (Doc. No. 81-7 at 61, 70), he reasoned that if he did not ban Hodge, and Hodge came back on site and did "something dangerous[,] . . . that would be the wrong decision." (Doc. No. 81-7 at 25.) Thus, Planeta independently evaluated the situation despite agreeing with Pope that Hodge posed an "immediate threat." (*Id.*)

Similarly, Blair demonstrated independent evaluation of the incident by telling Pope that he "would investigate" the incident upon first learning of the incident from Pope, by calling Baker to ask "what had happened," and by notifying Baker that Hodge was "temporarily banned" pending further investigation. (Doc. No. 81-2 at 12; Doc. No. 81-1 at 27-28.) In addition, Blair testified that at the time of the August 1 meeting, he had obtained Hodge's version of the altercation from Baker. (Doc. 81-2 at 34.) Finding no evidence of record reasonably disputing the decision making

-22-

processes of Planeta and Blair on July 25, no reasonable fact finder could conclude that Planeta and

Blair "rubber stamped" Pope's request that Hodge be banned on July 25.  *See Llampallas v. Mini-*

*Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (noting that the "cat's paw" theory did not

apply because the decision to suspend and discharge the plaintiff "was not simply a tacit approval

of [the biased recommender's] own decision to do the same").

Further, Blair's undisputed account of the August 1 meeting where a vote was taken to

permanently ban Hodge demonstrates independent investigation of the incident.  At the August 1

meeting, Blair listened to Pope recount his version of events, "realize[d] there was almost a physical

confrontation," and "g[ot] the impression that [Pope] felt threatened."  (Doc. No. 81-2 at 13, 15.)

Accordingly, although he had obtained Hodge's version of events from Baker prior to August 1,

(Doc. No. 81-2 at 33-34), Blair independently evaluated Pope's version of events on August 1.

*Dowlen*, 2007 WL 3010896, at *9; *Llampallas*, 163 F.3d at 1249.  Finding no evidence of record

that any of the other voters at the August 1 meeting failed to conduct an independent investigation

of the incident, Pope's presumed racial bias cannot be imputed to OUC under the "cat's paw"

theory.  *See Stimpson*, 186 F.3d at 1332 (noting that the "cat's paw" theory applies only if the

plaintiff shows that the decision maker failed to conduct an independent investigation).

### C.  Race Neutral Reasons Motivated Decision to Ban Hodge

As discussed below, Hodge's version of events includes the same facts identified by OUC

as its race-neutral reasons for permanently banning Hodge from the Stanton Energy Center.  Hodge

does not provide any evidence of a race related reason for his ban from OUC property except for the

single statement he testified that Pope made during the course of the altercation on July 25.  (Doc.

No. 79-8 at 2; Doc. No. 83-1 at 95.)  Therefore, regardless of whether Pope was a decision maker

or Pope's discriminatory animus is imputed to OUC under the "cat's paw" theory, no finder of fact could reasonably infer that OUC's decision to ban Hodge was motivated by or gave effect to any discriminatory animus held by Pope. *See Stimpson,* 186 F.3d at 1331 ("[T]he plaintiff must prove that the discriminatory animus behind the recommendation, *and not the underlying employee misconduct identified in the recommendation*, was an actual cause of the other party's decision to terminate the employee.") (emphasis added). For the same reason, it cannot reasonably be disputed that OUC would have made the same decision to ban Hodge regardless of whether Pope's presumed racial bias was imputed to OUC, and thus OUC is entitled to summary judgment. *Standard*, 161 F.3d at 1330.

### 1. Hodge's Version of Events

Hodge claimed that upon passing the ammonia tanker and stopping his truck, he saw Pope "all excited and waiving" and walking quickly towards him. (Doc. No. 83-1 at 88-89.) Upon opening his truck door, Hodge heard Pope shouting but could not understand what Pope was saying.[13] (*Id.* at 89.) Pope maintained that he shouted instructions for Hodge to remain in his truck, (Doc. No. 81-8 at 45), Bickhart heard the same, (Doc. No. 81-3 at 57), and there is no evidence of record to the contrary.

Although the evidence of record viewed in the light most favorable to Hodge shows that Hodge did not hear Pope's initial instructions to remain in his truck, (*id.* at 89; Doc. No. 81-8 at 45), it is undisputed that Hodge did not promptly comply with Pope's repeated instructions to get back in his truck, which Hodge heard Pope shout at least three times. (Doc. No. 83-1 at 91, 93.) Further,

_____

[13] Baker testified that Hodge acknowledged hearing Pope's instructions to remain in his truck, (Doc. No. 81-1 at 29), but the Court resolves this factual dispute in favor of Hodge for purposes of the instant analysis. *Anderson*, 477 U.S. at 255.

the evidence of record does not suggest that Hodge was unable to get back in his truck as Pope instructed.  Hodge contended that Pope "block[ed]" him from boarding his truck such that "he had to turn away from [Pope] to get back in [his] truck," but Hodge had no answer when asked during his deposition why he did not turn his back to Pope to reboard his truck as instructed.  (*Id.* at 98.) Hodge also claimed not to recognize Pope as the "safety supervisor" previously pointed out to him because Pope was not wearing a hard hat or vest like he previously wore.  (*Id.* at 121-22.)  However, Hodge did not assert, and there is no evidence of record suggesting, that he doubted Pope's authority to instruct him to get back in his truck.

According to Baker, Hodge admitted that he "got into a verbal confrontation" with Pope, (Doc. No. 81-1 at 29), and Hodge's version of events confirms this fact.  After getting out of his truck, being confronted by Pope,[14] and repeatedly being told by Pope to get back in his truck, Hodge stood his ground and insisted that Pope move back by stating, "[y]ou better back up; you're not speaking to your child here."  (Doc. No. 83-1 at 90-91.)  Pope then moved back.  (*Id.* at 91.)  Pope shouted at Hodge during the incident, (*id.* at 100), but Hodge shouted back at Pope "because [that was] the way [Pope] spoke to [him]," and at one point, Hodge "threw [his] hands up."  (*Id.* at 94.) Hodge asked Pope where the five mile per hour speed limit sign was posted, and after Pope pointed to the sign, Hodge shouted, "You expect me to see that?  You expect me to see that sitting there under the truck?"  (*Id.* at 95, 100.)  Thus, Hodge's version of events and the undisputed evidence of record show that Hodge got out of his truck, failed to return to his truck as instructed by Pope, and participated in a verbal confrontation with Pope.

---

[14] Pope asserted that Hodge approached him, (Doc. No. 81-8 at 46), but the Court must resolve this factual dispute in Hodge's favor at this time.  *Anderson*, 477 U.S. at 255.

## 2.  OUC's Basis for Permanently Banning Hodge on August 1

At the meeting on August 1, Pope recounted his version of the incident, and a vote was taken to permanently ban Hodge from the Stanton Energy Center.  (Doc. No. 81-2 at 13-14.)  There is no evidence of record that Pope's statement, "All you blacks are alike.  I'll get you." was discussed at the meeting.  The reasons for permanently banning Hodge at the August 1 meeting were identified by Blair during his deposition as follows:

> . . . [A]fter we heard all the evidence or listened to [Pope] and heard his side of the story and the full case, we decided – everybody basically took a vote that Mr. Hodge should be banned permanently from the site, since he was warned to stay inside the truck and he did not, and then he came out and they got into a verbal confrontation outside of the truck.
> . . .
> It was asked was there any objections, and everybody agreed in the meeting that he should be banned due to the fact that there was almost a physical confrontation.  Mr. Hodge got out of his truck after being warned several times by [Pope], and got in his face.  And in the meeting that's what came out, and everybody basically agreed that he should be banned.
> . . .
> [W]e felt that Hodge was a physical threat to OUC employees, and if that was the case, he should not be allowed back on site.

(Doc. No. 81-2 at 13-14, 32-33.)  There being no other evidence of record disclosing the reasons Hodge was permanently banned, it cannot be disputed that Hodge was permanently banned because he "was warned to stay inside the truck and did not" and because Hodge and Pope "got into a verbal confrontation outside of the truck" that was "almost a physical confrontation."  (Doc. No. 81-2 at 14, 32.)  The wisdom of banning Hodge for these race-neutral reasons is not a matter for this Court's consideration.  *See Alexander v. Fulton County*, 207 F.3d 1303, 1340 (11th Cir. 2000) ("[I]t is not the role of the Court to second-guess the wisdom of the employer's decision as long as [it was] not racially motivated.").

The record reflects that Hodge was permanently banned from the Stanton Energy Center for actions during the altercation with Pope that were established by Hodge's version of events. Therefore, the decision to permanently ban Hodge was not influenced by any discriminatory animus held by Pope in recounting his version of the incident for the decision makers. *See Dwyer v. Ethan Allen Retail, Inc.*, 325 F. App'x 755, 758 (11th Cir. 2009) (affirming summary judgment for the employer where the plaintiff was terminated on the basis of an allegedly biased report and noting that the information allegedly withheld from the decision maker was merely "trivial details not important to deciding whether [the plaintiff], in fact, violated" the policy for which she was terminated).

Contrary to Hodge's assertion, Gallucci, Planeta, and Pope did not provide testimony raising a genuine issue of material fact concerning whether the August 1 meeting actually occurred.  (Doc. No. 84 at 16.)  Gallucci testified during his deposition that he did not recall a meeting with Blair, Planeta, and Pope concerning the incident.  (Doc. No. 81-4 at 35-36.)  When Planeta was asked whether he attended a meeting with Pope and Gallucci on an unspecified date, he responded that he did not recall such a meeting.  (Doc. No. 81-7 at 43.)  These questions and responses do not squarely address the August 1 meeting recounted by Blair, but even if they did, the failure of Gallucci and Planeta to recall the meeting more than three years after it occurred, without more, does not create a genuine issue regarding whether the meeting actually occurred.  *See, e.g., Dickey v. Baptist Mem'l Hosp.-N. Miss.*, 146 F.3d 262, 266 n.1 (5th Cir. 1998) (noting that a witness' failure to recall that a telephone conversation occurred did not create a genuine dispute with the other speaker's testimony that the conversation actually occurred); *Linao v. GCR Tire Ctrs.*, No. 2:09-CV-134-RWS, 2010 WL 4683508, at *5 (N.D. Ga. Nov. 12, 2010) ("[W]here the only evidence

negating the existence of an event is a witness's failure to remember that event, . . . courts have declined to find a genuine issue of fact for summary judgment purposes" (citations omitted)). Further, Pope was not asked during his deposition whether he attended a meeting on August 1 with Gallucci, Planeta, Blair, and Gillingham, and Pope's testimony about meeting with Gallucci on August 1 to "explain [his] frustration with security," by itself, does not reasonably call into question whether the August 1 meeting recalled by Blair occurred.  (Doc. No. 81-8 at 94.)

Hodge further contends that the absence of any emails referencing the August 1 meeting creates a genuine issue regarding whether the meeting occurred.  (Doc. No. 84 at 16.)  The Court disagrees.  Blair testified that he was "page[d]" or "called" to the August 1 meeting, (Doc. No. 81-2 at 13, 32), and there is no evidence of record that any emails pertaining to the August 1 meeting were sent.

In summary, there is no evidence of record from which it may be reasonably inferred that Pope was a decision maker or that the decision to ban Hodge from OUC property was made without conducting an independent investigation of the incident.  Therefore, any bias held by Pope cannot be imputed to OUC, and summary judgment should be granted for OUC on Counts I and II.  *See Holifield*, 115 F.3d at 1563-64 ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." (citations omitted)). Alternatively, the evidence of record when viewed in the light most favorable to Hodge shows that he failed to remain in his truck and failed to return to his truck as instructed by Pope, that he participated in a confrontation with Pope outside his truck, and that OUC permanently banned him for those actions.  Thus, even if Pope's bias is attributable to OUC, the decision to permanently ban Hodge gave no effect to such bias, and summary judgment should be granted for OUC on Counts

I and II.  *See Stimpson*, 186 F.3d at 1332 (granting summary judgment for the defendant because the plaintiff introduced no evidence that could reasonably indicate that the alleged discriminatory animus influenced the decision to terminate the plaintiff).

## II.  Count I: Actionable Employment Relationship Between Hodge and OUC

OUC asserts that it is entitled to summary judgment on the Title VII claim in Count I because it had no actionable employment relationship with Hodge.  (Doc. No. 80 at 15-19); *see Llampallas*, 163 F.3d at 1243 ("Congress . . . meant to limit the pool of potential plaintiffs under Title VII; otherwise, any person could sue an 'employer' under the statute regardless of whether she actually had an employment relationship with that employer.").  Although it is undisputed that Hodge was an at-will employee of Dedicated Transport, not OUC, (Doc. No. 79-7 at 1), any "employer" as defined in 42 U.S.C. § 2000e(b) is prohibited under Title VII from "exerting any power it may have to foreclose, on invidious grounds, access by an individual to employment opportunities otherwise available to him."  *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988) (quoting *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338, 1341 (D.C. Cir. 1973)).  The Court need not address whether OUC had sufficient control over Hodge's employment opportunities to be liable on this basis because, as discussed above, OUC lawfully banned Hodge from the Stanton Energy Center for non-discriminatory reasons.

## III.  Count III: Tortious Interference with Contract against OUC

In Count III of the Amended Complaint, Hodge asserts a claim for tortious interference with contract against OUC.  (Doc. No. 31 at 12-13.)  OUC asserts that it is entitled to summary judgment on this claim because Hodge failed to comply with the pre-suit notice requirements imposed by Florida Statutes Section 768.28(6).  (Doc. No. 80 at 13-15.)  Hodge responds in opposition by

arguing that OUC is not subject to the statutory pre-suit notice requirement, and in the alternative, that the requisite notice has been cured or waived.  (Doc. No. 84 at 19-20.)  In its reply, OUC denies waiving compliance with Section 768.28.  (Doc. No. 85 at 9-10.)

Florida Statutes Section 768.28(6) states in pertinent part as follows:

An action may not be instituted on a claim against the state or one of its agencies or subdivisions unless the claimant presents the claim in writing to the appropriate agency, and also, except as to any claim against a municipality or the Spaceport Florida Authority, presents such claim in writing to the Department of [Financial Services], within 3 years after such claim accrues and the Department of [Financial Services] or the appropriate agency denies the claim in writing . . . .

In *Lederer v. Orlando Utils. Comm'n*, 981 So. 2d 521 (Fla. 5th DCA 2008), the Florida Fifth District Court of Appeal reasoned that because "OUC is not a municipality or a municipal department," the plaintiff was required to provide notice of her claim against OUC to the Department of Financial Services within three years after the accident at issue occurred pursuant to Section 768.28(6).  *Id.* at 526.  Accordingly, pre-suit notice under Section 768.28(6) is required to maintain suit against OUC.

Hodge's tortious interference claim against OUC accrued on August 1, 2007, the day he was permanently banned from the Stanton Energy Center.  *See Sellers v. Miami-Dade Cnty. Sch. Bd.*, 788 So. 2d 1086, 1087 (Fla. 3d DCA 2001) ("A cause of action accrues when the injury occurs and the damage is sustained." (quoting *Dep't of Transp. v. Soldovere*, 519 So. 2d 616, 617 (Fla. 1988))).  Hodge does not assert, and there is no evidence of record suggesting, that he attempted to comply with Section 768.28(6) prior to September 30, 2010, when his counsel mailed letters to OUC's counsel and the Florida Department of Financial Services ("Department") purporting to satisfy the

notice requirement of Section 768.28(6).[15]  (Doc. No. 84-3 at 3-4, 6-8.)  Therefore, Hodge failed to provide notice of his claim to the Department or OUC within three years of its accrual as required by Section 768.28(6), and the tortious interference claim in Count III must be dismissed unless Hodge establishes waiver or estoppel.  *See Brown v. State Dep't of Corrs.*, 701 So. 2d 1213 (Fla. 1st DCA 1997) ("Absent allegations or evidence of waiver of the notice or estoppel on the part of the State or other entity involved, '[w]here the time for such notice has expired so that it is apparent that the plaintiff cannot fulfill the requirement, the trial court has no alternative but to dismiss the complaint with prejudice.'" (quoting *Levine v. Dade Cnty. Sch. Bd.*, 442 So. 2d 210, 213 (Fla. 1983))).

Hodge argues that the Department waived compliance with Section 768.28(6) through its response to his September 30 letter dated October 29, 2010 ("October 29 Response").  (Doc. No. 84 at 20.)  The October 29 Response stated in pertinent part as follows:

> . . . The above captioned claim was presented to this Department for the purpose of complying with the notice provision contained in Section 768.28(6), Florida Statutes.
>
> Please be advised that the [Department] has no financial interest in this claim.
>
> For your future reference, it is not necessary to notify the [Department] regarding a claim against a city or municipal entity.

(Doc. No. 84-3 at 9.)

The October 29 Response is inconsistent with *Lederer*, in which the Florida Fifth District Court of Appeal held that pre-suit notice under Section 768.28(6) was required when suing OUC because "OUC is not a municipality or a municipal department."  *Lederer*, 981 So. 2d at 526.

---

[15] Hodge admitted that "for the time period beginning July 25, 2007 and ending July 25, 2010, [he] never provided the [Department] with written notice of [his] claims against OUC."  (Doc. No. 80-2 at 1.)

However, the October 30 Response does not constitute waiver of notice under Section 768.28(6) because it was issued in response to notice given by Hodge after the three-year notice period under Section 768.28(6) had expired.  *See Levine*, 442 So. 2d at 212-13 (requiring strict construction of Section 768.28(6) and noting that "where the time for such notice has expired so that it is apparent that the plaintiff cannot fulfill the requirement, the trial court has no alternative but to dismiss the complaint with prejudice." (citation omitted)); *Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. 2d 1098, 1104 (Fla. 5th DCA 2006) ("The elements of waiver are: (1) the existence *at the time of the waiver* of a right, . . . which may be waived . . . ." (emphasis added) (citation omitted)).  Finding no other arguments by Hodge or authority to the contrary, Hodge's failure to timely notify the Department of its claim under Section 768.28(6) requires the entry of summary judgment for OUC on the tortious interference claim in Count III.[16]  *See Broward Cnty. Sch. Bd. v. Joseph*, 756 So. 2d 1077, 1078 (Fla. 4th DCA 2000) ("Failure to provide notice to the [Department] is fatal to Joseph's claim because he can never satisfy the conditions precedent to filing suit [under Section 768.28(6)].").

---

[16] The Court need not address Hodge's arguments that OUC waived compliance with the notice provision of Section 768.28(6) because notice must be provided to both OUC and the Department under that provision and because there is no evidence that OUC prevented Hodge from properly notifying the Department.  *See Menendez v. N. Broward Hosp. Dist.*, 537 So. 2d 89, 90-91 (Fla. 1988) (holding that the notice required to the Department under Section 768.28(6) cannot be waived by conduct of the defendant-agency named in a suit where the failure to give timely notice to the Department could not be attributed to the defendant-agency's conduct); *Wall v. Palm Beach Cnty.*, 743 So. 2d 44, 44-45 (Fla. 4th DCA 1999) (noting that a county may waive compliance with Section 768.28(6) to itself but not the Department and that notice to both the county and the Department is essential to maintaining a cause of action (citing *Menendez*, 537 So. 2d at 91)).

**IV.  Count IV: Tortious Interference with Contract against Pope**

In Count IV of the Amended Complaint, Hodge asserts a claim for tortious interference with contract against Pope.  (Doc. No. 31 at 13-14.)  Pope asserts that he should receive summary judgment on this claim because: (1) he had no knowledge of Hodge's employment relationship with Dedicated Transport; (2) he did not make the decision to ban Hodge from the Stanton Energy Center; and (3) there is no evidence of malicious intent that Dedicated Transport terminate Hodge's contract.  (Doc. No. 79 at 12-16.)

A claim for tortious interference requires proof of four elements: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985).  "Imbedded within these elements is the requirement that the plaintiff establish that the defendant's conduct caused or induced the breach that resulted in the plaintiff's damages." *Chicago Title Ins. Co. v. Alday-Donalson Title Co. of Fla., Inc.*, 832 So. 2d 810, 814 (Fla. 2d DCA 2002) (citing *St. John's River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500, 504 (Fla. 5th DCA 2001)).  "In considering the element of causation, Florida courts have held that the plaintiff must plead and prove that the defendant manifested a specific intent to interfere with the business relationship." *Id.* (citations omitted).  "Thus, even if the defendant is aware of the existing business relationship, the defendant will not be liable for tortious interference with that relationship unless there is evidence that the defendant intended to procure a breach of the contract." *Id.* (citations omitted).

Regardless of whether Pope participated in the decision to ban Hodge or had sufficient knowledge of the employment relationship between Hodge and Dedicated Transport to be liable for tortious interference, Pope is entitled to summary judgment because there is no evidence of record permitting a reasonable inference that Pope intended to interfere with that employment relationship, as opposed to merely ban Hodge from the Stanton Energy Center. *See id.* ("[E]ven if the defendant is aware of the existing business relationship, the defendant will not be liable for tortious interference with that relationship unless there is evidence that the defendant intended to procure a breach of the contract.").

It may be inferred from the evidence of record when viewed in the light most favorable to Hodge that Pope wanted Hodge banned from the Stanton Energy Center. Hodge claimed that Pope said, "I'm calling security to throw you out of here," "All you blacks are alike," and "I'll get you." (Doc. No. 83-1 at 95.) Thereafter, Pope requested OUC security personnel, Planeta, and Blair to ban Hodge. (Doc. No. 81-6 at 15; Doc. No. 81-8 at 76, 78; Doc. No. 81-2 at 11.)

Despite Pope's actions reflecting an intent to have Hodge banned from the Stanton Energy Center, there is no evidence of record permitting a reasonable inference that Pope intended Hodge to be terminated from Dedicated Transport. It is undisputed that Hodge was terminated from Dedicated Transport solely because Dedicated Transport had no work for Hodge that did not require entry into the Stanton Energy Center. (Doc. No. 81-1 at 65-66, 75-77.) However, Pope averred that at the time Hodge was banned, he did not know that the decision to ban Hodge "would mean that [Dedicated Transport] would not have work available for [Hodge]." (Doc. No. 79-5 ¶ 5). Pope further asserted that at the time Hodge was banned, he was aware that OUC had contracted with Dedicated Transport for the delivery of lime slurry to the Stanton Energy Center but had no

-34-

knowledge of the provisions of that contract and had no role in administering that contract.  (*Id.* ¶¶ 3, 7.)

There is no evidence of record contrary to Pope's averments or suggesting that Pope knew Dedicated Transport delivered lime slurry only to the Stanton Energy Center.  Pope testified during his deposition that he had no personal knowledge as to whether Dedicated Transport delivered lime slurry to locations other than the Stanton Energy Center.  (Doc. No. 81-8 at 121-22.)  Although Planeta and Blair knew that Hodge could have lost his job if he was banned from the Stanton Energy Center, (Doc. No. 81-7 at 28), there is no evidence of record that Pope knew this.

Viewing the foregoing evidence in the light most favorable to Hodge, his termination from Dedicated Transport was an unintended consequence of Pope's intentional actions to ban Hodge from the Stanton Energy Center, and thus Pope cannot be liable for tortiously interfering with Hodge's employment contract.  *See Chicago Title*, 832 So. 2d at 814 ("[E]ven if the defendant is aware of the existing business relationship, the defendant will not be liable for tortious interference with that relationship unless there is evidence that the defendant intended to procure a breach of the contract."); *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1224 (Fla. 3d DCA 1980) ("There is no such thing as a cause of action for interference which is only . . . consequentially effected." (citations omitted)).  Accordingly, summary judgment is granted for Pope on the tortious interference claim in Count IV.

## Conclusion

Based on the foregoing, it is hereby **ORDERED** and **ADJUDGED** that the Motions for Summary Judgment by Defendants David Pope and Orlando Utilities Commission (Doc. Nos. 79-

80) are **GRANTED**.  The Clerk of Court is directed to enter judgment in favor of Defendants David

Pope and Orlando Utilities Commission and against Plaintiff Desmond Hodge.

   **DONE** and **ORDERED** in Chambers in Orlando, Florida on January 26, 2011.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT


Copies furnished to:

Counsel of Record